UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **CURTIS L. HINER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **VS.** | )   **Civil Action No.  SA-11-CA-0184-XR** |
| | ) |
| **JOHN M. McHUGH, Secretary of the** | ) |
| **Army, Department of the Army,** | ) |
| | ) |
| **Defendant.** | ) |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant's Motion for Summary Judgment, Plaintiff's

Response, and Defendant's Reply.  For the reasons stated below, Defendant's motion is granted.

### I. Factual and Procedural Background

Plaintiff Curtis L. Hiner is employed as a civilian GS-13 by the Department of the Army.

Since 2006,  Plaintiff has been the Chief of Administration, Logistics and Support Division in the

Civil Support Readiness Directorate, now known as the Civil Support Training Activity (CSTA) for

U.S. Army North (ARNO) at Ft. Sam Houston, Texas.  On January 15, 2009, Joseph Hunt, Director

of the Civil Support Readiness Directorate, sent an email to all eligible employees, informing them

of the opportunity to apply for the upcoming Division Chief vacancy (a GS-14 position).  To select

an employee for the vacancy, a selection committee was formed, consisting of William Havlic,

Joseph Hunt, and William Sherman.  On January 22, 2009, the selection committee selected John

Branum for the position of Division Chief, YC-0301-02, Echo (Recon) Division.

On or about March 17, 2009, Plaintiff initiated his contact with the Equal Employment

Opportunity Commission (EEOC), and on or about April 23, 2009, he submitted a formal EEO complaint alleging discrimination.  Plaintiff alleged that his qualifications for the vacancy were superior to those of John Branum, and that he was not selected for the position because the selection committee discriminated against him on the basis of his race, Black.

On March 4, 2011, Plaintiff filed a Complaint (docket no. 1) against Defendant, alleging that Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 from March 4, 2009 through June 29, 2009.  42 U.S.C. §§ 2000e-2(a) and 2000e-3(a). The basis for Plaintiff's allegations of unlawful employment practices is that Plaintiff was not selected for the position of Division Chief, YC-0301-02, Echo (Recon) Division due to his race, Black, even though he was more qualified than the employee who was selected for the position (and whose race is Caucasian).  Additionally, Plaintiff alleges that following the complaint he filed with the EEOC, he was subjected to a hostile work environment and retaliation.

## II. Legal Standard

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Furthermore, the court must draw reasonable inferences and construe evidence in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment.  *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

2

### III. Analysis

Title VII prohibits employers from discriminating against employees with respect to their compensation, terms, conditions, or privileges of employment on the basis of race, color, sex, religion, or national origin.  42 U.S.C. §§ 2000e-2(a)(1).  Plaintiff alleges that Defendant violated Title VII by: 1) subjecting Plaintiff to disparate treatment by declining to select him for the position of Division Chief; 2) creating a hostile work environment for Plaintiff; and 3) retaliating against him following his complaint to the EEOC.  Plaintiff asserts that he was treated in a discriminatory way because of his race, Black.

**A. Non-selection for the Position of Division Chief**

Plaintiff alleges that Defendant violated Title VII by refusing to offer him the position of Division Chief, despite his qualifications, on the basis of his race, Black.  To establish a *prima facie* case of discrimination under Title VII, a plaintiff is required to demonstrate that: 1) he is a member of a protected class; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) he was either replaced by another employee not from a protected class or he was treated less favorably than other similarly situated employees outside the protected class.  *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

If the plaintiff establishes the elements of the *prima facie* case, then the burden shifts to the defendant, who must then rebut the plaintiff's case by providing a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the defendant presents such a reason, the burden shifts back to the plaintiff.  *Id.* at 804.  The plaintiff  must then show that the defendant's reasons for the adverse employment action are mere pretexts for discrimination.  *Id.* at 804-05.

Plaintiff's *prima facie* case states that: 1) due to his race, Black, he is a member of a protected class; 2) he was qualified for the position of Division Chief and in particular, had higher qualifications than the selectee, John Branum; 3) he was not selected to the position of Division Chief despite his qualifications and was therefore subject to an adverse employment action; and 4) the employee selected for the position of Division Chief was not as qualified as Plaintiff and was Caucasian.

In its Motion for Summary Judgment, Defendant rebuts Plaintiff's case by providing a legitimate, nondiscriminatory reason for declining to select Plaintiff to the position of Division Chief. Defendant offers evidence to demonstrate that the selection committee reviewed applications for the position of Division Chief using a concrete set of criteria to evaluate and rank all applicants.

Defendant explains that after the advertisement of the new position, a selection committee was formed to review the applications of five individuals who had demonstrated an interest in the position: James Barkley (African American), John Branum (Caucasian), Curtis Hiner (African American), Ed Hrna (Caucasian), and Mark Welch (African American). The committee members, William Havlic, Joseph Hunt, and William Sherman, considered the applicants' resumes as well as their personal knowledge of the applicants and their performance in their respective capacities at the agency. The selection committee used a scoring composite under which all five applicants were evaluated according to the following categories: Education (Civilian Schooling), Training (Military Training/Technical Training and Ability), Experience/Knowledge (Directly related to MCD, RECON & Search/Extraction Operations), Writing & Planning Skills, Leadership & Team Building Skills, Knowledge of MCD and RECON Equipment, and Oral Skills (Presentations, AARs & Briefings). These categories were tailored to the responsibilities that would be required for the new position,

which included the development and execution of training and readiness evaluations and support of state National Guard Weapons of Mass Destruction, Chemical, Biological, Radiological/Nuclear, and Explosive Civil Support Response Teams.

Each selection committee member gave each of the applicants a score out of five possible points for each of the categories.  When totaled, the scores yielded the following rankings:

| Applicant | Ranking points |
| --- | --- |
| John Branum (selectee) | 96 |
| James Barkley (first alternate) | 91 |
| Mark Welch (second alternate) | 80 |
| Ed Hrna | 76 |
| Curtis Hiner | 57.5 |

John Branum earned the highest ranking in part because of his experience as a former Marine Corps Officer, his similar position with CSRD at the time, his leadership experience, and his high qualifications in CBRNE and Operations.  Plaintiff Curtis Hiner was ranked last primarily due to the low scores he received in the Experience/Knowledge and in the Knowledge of MCD and RECON Equipment sections.

Defendant emphasizes the nondiscriminatory, transparent, and objective nature of the selection process by demonstrating that the selection committee's rankings were subsequently used on February 18, 2009 to recommend the second-highest-scoring candidate, James Barkley (African American), for another newly created Division Chief position.  Defendant asserts that it did not discriminate based on the race of the applicants, but rather differentiated among their capabilities. Defendant underlines the fact that an African American, James Barkley, was appointed to the second position of Division Chief in order to show that neither the Department of the Army nor the selection

committee displayed any discriminatory animus toward Plaintiff or toward other members of the protected class to which he belonged.[1]

In his response to Defendant's Motion for Summary Judgment, Plaintiff attempts to show that the Defendant's reasons for the adverse employment action are mere pretexts for discrimination. However, Plaintiff admits that his resume and Mr. Branum's resume are comparable.[2]  Plaintiff, however, was required to demonstrate that he was "clearly better qualified."  Plaintiff fails to do so and summary judgment is proper as to the denial of promotion claim.  *Criner v. Texas--New Mexico Power Co.*, 470 Fed. Appx. 364, 370 (5th Cir. 2012); *Dixon v. Comal County, Tex.*, 447 Fed.Appx. 638, 113 FEP Cases 1262 (5th Cir. 2011).  Plaintiff also argues that Mr. Branum was "pre-selected" for the position perhaps because there was some preference extended to individuals who formerly worked for AT&T.[3]  This, however, is not evidence of race discrimination.[4]  Plaintiff further attempts to argue that Mr. Branum did not meet the minimum qualifications for the position because he had not worked as a GS-13 for at least one year.  This was rebutted by the Declaration of Amy Straka, a human resource specialist.[5]

---

[1]Testimony of John Hunt, July 30, 2009 at pp. 98-108; Testimony of William Havlic, July 30, 2009 at pp. 235-236.

[2]"John is more experienced than I am in certain areas, I'm more experienced than he is in other areas."  Plaintiff's Depo at p. 27.

[3]Plaintiff's Depo at p. 65.

[4]Indeed Plaintiff concedes that two of the three members of the selection panel were not biased against him because of his race.  Plaintiff's Depo at pp. 61, 63 (Mr. Havlic and Mr. Sherman not biased).  Plaintiff further concedes that the categories used to rate the candidates were valid and job-related.  Plaintiff's Depo at p. 65.

[5]"[T]he one-year in grade at the immediately lower GS level was not required."  Doc. No. 16-5.

**B. Hostile Work Environment Claim**

Plaintiff alleges that Defendant's discriminatory actions based on his race created a hostile work environment.  A hostile work environment exists when workplace harassment is sufficiently pervasive so as to affect a term, condition, or privilege of employment.  *Id.*  For harassment to be "sufficiently pervasive," it does not need to reach a level that would cause tangible psychological injury; it may simply detract from an employee's job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.  *Id.* at 21-22.  However, the harassment must be more than merely offensive, and the work environment must be objectively and subjectively abusive.  *Id.* at 21.  To determine whether an environment is hostile or abusive, all the circumstances of the alleged incidents must be taken into consideration.  *Id.* at 23.  The court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*

Plaintiff alleges that there were other examples of inequality of treatment of African Americans at the workplace.  He offers the affidavit of Pamela Ward, the former Deputy Chief of the Directorate, in which she stated that she observed Mr. Hunt's practice of denying African Americans the same step increases as their white counterparts.  Another African American employee, Mr. Barnes, also made several complaints about being subject to an abusive work environment by another Division Chief.

As part of his hostile work environment claim, Plaintiff also incorporates his non-selection to the position of Division Chief, and the following incidents, which Plaintiff attributes to Defendant's retaliation in response to his complaint to the EEOC (discussed at length in Section C:

7

Title VII Retaliation Claim): 1) on May 14, 2009, Joseph Hunt talked down to Plaintiff, cursed at him, belittled him, and tried to intimidate him; 2) from June 8, 2009 to June 19, 2009, Defendant arbitrarily increased Plaintiff's duties; and 3) on June 29, 2009, Defendant denied Plaintiff the opportunity to go to a ten-day observer controller training.

In addition, Plaintiff alleges that his first-line supervisor, Jesus Daniel Ramirez, would remind him two or three times per week that "Joe doesn't like your Black ass" and "Joe is going to fire your Black ass" (referring to Joseph Hunt).[6]   At the EEOC proceedings in front of the Administrative Judge, Mr. Ramirez confirmed that he made those statements.

To demonstrate the Defendant's hostility toward African Americans, Plaintiff also points to the fact that Joseph Hunt displayed the portrait of Nathan Bedford Forrest, the founder and first Imperial Wizard of the Ku Klux Klan, outside his office.  Pamela Ward allegedly informed Joseph Hunt about the possibility that the portrait may offend some employees, but allegedly Mr. Hunt refused to remove the portrait.  After Plaintiff complained about the portrait to Mr. Gressler, the Deputy Chief of Staff of the organization, the portrait was removed.  Plaintiff considers the display of the portrait to be a reminder of the racist attitude and hostile environment at his workplace.

To determine the factual support of Plaintiff's claims, the Court was required to review all pages of the exhibits tendered by the parties.  That review indicates that Plaintiff's claim of being "belittled" resulted from Mr. Hunt behaving rudely when Plaintiff handed him a fax stating that some employees may have been exposed to radiation.[7]  Plaintiff, however, acknowledges that Mr. Hunt

---

[6]Testimony of Ramirez at doc. 19-8.

[7]On May 14, 2009, Defendant states that Joseph Hunt was distraught by Plaintiff's statement that two employees had been exposed to radiation.  When Plaintiff handed Joseph Hunt the facsimile reporting the incident, Mr. Hunt interrupted Plaintiff, snatched the report from him, stated, "Well,

has acted in a similar manner with other employees.  Accordingly, Plaintiff has not established that Mr. Hunt's inappropriate behavior and use of rude language was directed at him because of his race.[8]

With regard to the claim that his work duties were increased, it is undisputed that all segments of the agency were burdened with work.[9]  Plaintiff only offers his subjective belief and conclusory statement that he "felt somebody was trying to put pressure on [him] to quit."[10]  Subjective belief and conclusory statements, however, are insufficient to defeat a motion for summary judgment. *Stallworth v. Singing River Health System*, 469 Fed. Appx. 369, 372 (5th Cir. 2012).

With regard to the denial of training claim, Mr. Hunt testified that because Plaintiff was complaining of his existing workload, he questioned why he was being sent to travel status in Puerto Rico.  Mr. Hunt also questioned the need to send Mr. Hunt when it would be less costly to send someone from Atlanta.[11]  Plaintiff presents no evidence that this denial of TDY status was because of his race.

With regard to the picture of Nathan Bedford Forrest, Mr. Hunt testified that he selected a

---

let me read the damn thing," and closed the door.  Defendant asserts that Mr. Hunt apologized to him later that day.

[8]Plaintiff's Depo at p. 52.  Plaintiff also testified that Mr. Hunt cursed at a white employee.  Plaintiff's Depo at pp. 100-101.

[9]Defendant offers evidence to show that other employees within CSTA were experiencing a similar increased workload due to the organization's growth and the need to process the hiring of approximately thirty new personnel.  Following Plaintiff's complaint to Mr. Ramirez regarding his increased responsibilities, Mr. Ramirez suggested that Plaintiff ask a wounded warrior or reservist to assist him with his work.  Additional staff was eventually hired to assist Plaintiff and facilitate the organization's expansion.

[10]Plaintiff's Depo at p. 58.

[11]Testimony of John Hunt, July 30, 2009 at pp. 148-149.

number of posters to display and that he liked the picture of a general mounted on a horse looking solitary and contemplative.  The poster was titled "The Commander."  Mr. Hunt testified that no one had complained to him about the poster prior to Plaintiff's complaint to the Deputy Chief of Staff, Mark Gressler.  He further testified that he did not intend to have any relationship the "second part of [Nathan Bedford Forrest's] life" and that he removed the poster after the complaint.[12]  Defendant asserts, and Plaintiff does not dispute, that the poster was removed in 2006 or 2007, long before the allegations in this case.

With regard to the comments made by Mr. Ramirez, the comments were unprofessional and inexcusable.  Nevertheless, Plaintiff fails to provide any evidence that Mr. Hunt ever made such statements or that he made any complaints to anyone about the statements made by Mr. Ramirez.

With regard to the affidavit of Pamela Ward, Ms. Ward states that Mr. Hunt oftentimes did not select the individual recommended by a board and would hire or promote who he wanted.  Mr. Hunt allegedly also told certain individuals that they would be promoted, prior to any formal selection board being convened.  This may likely be poor management practices, but is not competent evidence of race discrimination.  Ms. Ward also states that Mr. Hunt granted some employees "step increases", but did not grant step increases to other employees and that the "pattern appeared to be Caucasian males would be granted this request and given the step increase."  Subjective belief, however, is not competent summary judgment evidence.  Further, Ms. Ward opines that morale within the agency "was at an all-time low due to the lack of support to the division chiefs from Mr. Hunt.  He deferred all problems to Mr. Bill Havlic, and, in my opinion, changing his 'open door policy' to a 'not my problem' policy."  Again, alleged poor management

---

[12]Joseph F. Hunt Depo at pp. 58-61.

practices in and of themselves, do not constitute competent evidence of discrimination or a hostile work environment based on race.

Finally, Plaintiff offers no competent summary judgment evidence that any of the above actions he complains of unreasonably interfered with his work performance.[6]

## C. Title VII Retaliation Claim

To establish a *prima facie* case for unlawful retaliation under Title VII, a plaintiff must show that: 1) he engaged in activity protected by Title VII; 2) an adverse employment action occurred; and 3) there is a causal link between the protected activity and the adverse employment action.  *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).  An employee has engaged in protected activity if he or she has: 1) opposed any practice made an unlawful practice by Title VII; or 2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.  *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427-28 (5th Cir. 2000).  For an employers' actions to be retaliatory they "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

As in all burden-shifting cases under Title VII, once the plaintiff establishes the elements of the *prima facie* case, the burden shifts to the defendant, who must then rebut the plaintiff's case by providing a legitimate, nondiscriminatory reason for the retaliatory adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the defendant presents such a reason, the burden shifts back to the plaintiff.  *Id.* at 804.  The plaintiff must then show that the defendant's reasons for the adverse employment action are mere pretexts for retaliation.

---

[6]Plaintiff's Depo at pp. 133-134.

11

Plaintiff established the frst element of his *prima facie* case for unlawful retaliation by demonstrating that he engaged in activity protected by Title VII by filing a complaint to the EEOC, charging Defendant with discriminatory employment practices.

Plaintiff has pled that an adverse employment action occurred from June 8, 2009 to June 19, 2009, when Defendant arbitrarily increased his duties; and on June 29, 2009, when Defendant denied Plaintiff the opportunity to go to a ten-day observer controller training (OCT).  However, as stated above, the Defendant has articulated legitimate, non-retaliatory reasons for the actions.  Accordingly, Plaintiff fails to establish that there is a causal link between Plaintiff's complaint to EEOC and the adverse employment actions he suffered in May-June 2009.

### Conclusion

Defendant's motion for summary judgment (doc. no. 15) is granted.  The remaining motions in this case are dismissed as moot.  The Clerk is directed to enter judgment in favor of the Defendant.  Costs shall be awarded to Defendant and a Bill of Costs in the form required by the Clerk of Court, together with supporting documentation, shall be filed within fourteen days of the Judgment.

SIGNED this 27th day of August, 2012.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE